2000 OK CR 17

**Kevin YOUNG, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–98–703.**

Court of Criminal Appeals of Oklahoma.

Sept. 6, 2000.

As Corrected on Denial
of Rehearing Oct. 26, 2000.

Barry Albert, Vince Antonioli, Asst. Public Defenders, Oklahoma City, for Defendant at trial.

Fern Smith, Philip Anderson, Assistant District Attorneys, Oklahoma City, for the State at trial.

Carolyn L. Merritt, Asst. Public Defender, Oklahoma City, For Appellant on appeal.

W.A. Drew Edmondson, Attorney General, William L. Humes, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

***OPINION***

JOHNSON, Judge:

¶ 1 Kevin Young was tried by a jury in the District Court of Oklahoma County, Case No. CF 96–2963, before the Honorable Nancy L. Coats, District Judge.[1] Young was found guilty of (Count I) Murder in the First Degree (malice aforethought), in violation of 21 O.S.1991, § 701.7(A); (Count II) Attempted Robbery with Firearms, in violation of 21 O.S.1991, § 801; and (Count III) Shooting with Intent to Kill, in violation of 21 O.S. 1991, § 652. The jury fixed punishment at twenty (20) years imprisonment on Count II and thirty (30) years imprisonment on Count III. After finding the existence of three aggravating circumstances, the jury set punishment at death on Count I.[2] The trial court sentenced accordingly and ordered the sentences imposed on Counts II and III be served concurrently with each other and consecutively to the death sentence. Appellant thereafter filed his appeal.[3]

¶ 2 This case arose from a shooting during an attempted robbery at the Charles Steak House in Oklahoma City in the early morning hours of May 14, 1996, where Joseph Sutton ran a gambling operation in a back room. Sometime after midnight on May 14, 1996, two African–American men, armed with guns, entered the Charles Steak House, and walked into the gaming room.

¶ 3 Karl Robinson testified the taller man said "[a]ll you SOBs are going to die." George Edwards heard the same man say he was going to kill everyone. When Edwards saw the taller man pull a gun, Edwards grabbed the gun and held it in the air while the taller man fired it repeatedly until the gun was emptied. At this same time, the shorter of the two men pulled his gun, pointed it in the air and said "[w]e come for the money." Joseph Sutton threw something on the floor, pulled his own gun, pointed it at the shorter man and tried to fire it, but a bullet was not chambered and the gun did not fire. The shorter man then fired on Sutton.

¶ 4 Sutton was shot four times and died as a result of a gunshot wound to his abdomen. Quintin Battle, who was in between Sutton and the shorter gunman, was shot twice during the gunfire. Battle testified he dropped to the floor when the shooting began, because he feared he would be shot and killed. George Edwards suffered powder burns on his arms and face while struggling with the taller gunman.

¶ 5 Both gunmen ran from the Charles Steak House after the shooting. One ran down North Lottie, away from the restaurant, holding his arm.

¶ 6 Within minutes of the shooting, Appellant arrived at Presbyterian Hospital emer-

---

1. Appellant's co-defendant, Antwuan David Jackson, was tried separately and was acquitted.

2. The jury found (1) that Mr. Young had been previously convicted of a felony involving the threat or use of violence; (2) that Mr. Young constituted a continuing threat to society; and, (3) that Mr. Young's actions created a great risk of death to more than one person.

3. Appellant's Petition in Error was filed January 29, 1999, and Appellant's Brief was filed June 21, 1999. The State's Answer Brief was filed on October 19, 1999, and Appellant's Reply Brief was filed on November 8, 1999. This matter was remanded for an evidentiary hearing on January 14, 2000. Following the evidentiary hearing, the State filed a Supplemental Brief on February 23, 2000, and Appellant filed a Supplemental Brief on February 25, 2000. Oral Argument was heard on April 11, 2000. Supplemental authorities were filed by Appellant on April 20, 2000.

gency room with three gunshot wounds.[4] He told emergency personnel his name was "Roy Brown." He had a bullet in his left chest, another bullet wound to his right thigh, and a third grazing wound to his right shoulder. Hospital personnel reported the gunshot victim to the police.

¶ 7 Officer Cook, who was responding to the Charles Steak House shooting, heard dispatch report a gunshot victim at Presbyterian Hospital. He went to the hospital and asked "Roy Brown" if he was at the Charles Steak House. Appellant told officer Cook he had not been there and said he was shot near a 7–11 convenience store and an Autozone store. Appellant told officer Cook he rode a bus to the hospital and did not know where he was shot because he was from out of state. Officer Cook testified he knew Metro Transit buses did not operate after midnight and he suspected "Roy Brown" had in fact been involved in the Charles Steak House shooting. He contacted officers at the shooting scene and asked if any witnesses there could identify the shooter.

¶ 8 Appellant also spoke with Officer Smith at the hospital and gave him a different date of birth than he gave officer Cook. He told officer Smith he was shot near a 7–11 convenience store and an Autozone store, but said he did not know how he got to the hospital.

¶ 9 Within thirty (30) minutes of the shooting, Karl Robinson and Ben Griffin were brought separately to the hospital to see if they could identify the person in the emergency room. Karl Robinson saw Appellant lying on a gurney. Robinson was unsure whether Appellant was one of the gunmen until he saw Appellant's shirt on the floor. He told the officers the shirt looked the same. Robinson was unable to identify Appellant at the preliminary hearing, but positively identified Appellant at trial.

¶ 10 Ben Griffin thought Appellant was one of the shooters and asked to see the shirt he was wearing. After he saw the shirt, he too affirmatively identified Appellant as one of the shooters.[5] Griffin could not identify Appellant at preliminary hearing and did not try to identify him at trial.

¶ 11 No weapons were recovered at the scene of the shooting. However, a .38 caliber Smith and Wesson revolver[6] containing six spent shell casings was found in a trash can about two blocks from Presbyterian Hospital. The woman who found the gun heard someone drop it in her curbside garbage can around 12:30 a.m. on May 14, 1996. The deceased's Sphinx .380 semiautomatic pistol[7] was given to police officers by the owner of the restaurant a couple of days after the shooting. The owner obtained the gun from the restaurant manager who had hidden the gun and taken the deceased's wallet and money from his pockets immediately after the shooting. Police officers also recovered a .9mm handgun and $500.00 from a van belonging to Ben Griffin.

¶ 12 Ballistics and firearms testing were done on the recovered weapons, projectiles and casings found at the scene and recovered from the deceased. Four full metal jacket bullets recovered from the shooting scene were .380 caliber and were determined to have been fired from the deceased's gun. Eight .380 caliber auto fired casings were found to be consistent with having been fired from the deceased's gun. Two lead projectiles found at the scene had insufficient markings for ballistics comparison. Two copper jacket projectiles could not have been fired from any gun recovered. One projectile found at the scene was consistent with having been fired from the .38 caliber Smith and Wesson revolver that was found in the trash can.[8] Two bullets recovered from the deceased were consistent with having been fired from the .38 caliber Smith and Wesson revolver. All six casings found in the .38 caliber Smith and Wesson were positively identified as having been fired from that gun.

---

4. The Charles Steak House, located at 2307 N. Lottie, is approximately a mile from the hospital.

5. Witnesses described the shirt the "shorter" man was wearing as dark colored with a lighter colored design in the middle.

6. State's Exhibit 25.

7. State's Exhibit 28.

8. State's Exhibit 20.

¶ 13 Blood samples were collected from the shooting scene and were also taken from the deceased Joseph Sutton, Quintin Battle, the codefendant Antwuan Jackson, and from Appellant. Of three blood swabbings collected from the scene, one positively matched the deceased's blood sample, another did not match any known sample, and the third positively matched Appellant's blood sample. DNA testing confirmed a positive match of the blood sample collected from the shooting scene with Appellant's blood sample. Two DNA forensic chemists testified to the positive match, and one estimated the combined probability results of a match would occur in the African–American population only one in one hundred thirty-two million times (1:132,-000,000).

¶ 14 Around 6:30 a.m. on May 14th, Appellant was released to Oklahoma City police custody. A bullet remained in his back left side, below his shoulder blades. Over a year later, Appellant saw the county jail doctor[9] complaining of pain and drainage from where the bullet was embedded. The doctor prescribed antibiotics, but Appellant never returned to have the bullet removed. Dr. Jett, a surgeon, saw Appellant about four weeks later for the purpose of removing the bullet,[10] and determined the bullet was no longer there. Dr. Jett testified a fresh wound was present where the bullet should have been.

¶ 15 During second stage proceedings, the State introduced a certified copy of a Judgment and Sentence from California, reflecting Appellant's previous felony convictions from January 22, 1991, for shooting into an occupied vehicle, second degree robbery and assault with a firearm. Appellant stipulated he was the defendant shown on the Judgment and Sentence, and the convictions were final, felony convictions.

¶ 16 Tashella Sutton–Dickerson, the deceased's daughter, gave a victim impact statement. Further, an employee of the Oklahoma County Detention Center testified Appellant had a clean behavior record at the county jail. Phillip Murphy, Ph.D., a licensed clinical psychologist, conducted psychological tests on Appellant and concluded Appellant was "clearly competent to stand trial," was "at least normal if not somewhat above average intellect," and showed no sign of brain damage or psychiatric disorders. He described Appellant as a fairly easygoing, well-dispositioned individual and said he did not think Appellant was antisocial despite his criminal history. In Dr. Murphy's opinion, Appellant would not be a continuing threat to society or a danger to society in a structured prison environment. Appellant's sister testified about Appellant's family history and described Appellant as a "no-problem child" and good student who attended a good school. After Appellant moved away from home, she suspected he might be involved with a gang.

¶ 17 Other relevant facts will be discussed as necessary under the related propositions of error.

*Jury Related Issues*

¶ 18 In Proposition Two, Appellant contends the trial court's restriction of the scope of voir dire violated the Oklahoma and federal constitutions. He specifically complains the trial court's failure to allow defense counsel to inquire into prospective jurors' ability to consider lesser degrees of homicide violated his right to a fair and impartial jury and trial.

¶ 19 The purpose of voir dire examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. *Mayes v. State,* 1994 OK CR 44, ¶ 17, 887 P.2d 1288, 1298, *cert. denied,* 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995); *Duvall v. State,* 1991 OK CR 64, ¶ 29, 825 P.2d 621, 631, *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). The manner and extent

9. Dr. Harvey testified he examined Appellant on August 1, 1997.

10. The State filed a Motion to Compel Defendant to Submit to Physical Examination by State's Surgeon on August 14, 1997. The purpose for the requested examination was to allow the surgeon to determine what type of procedure would be necessary for removal of the bullet. The Motion was granted on August 29, 1997, and provided for Appellant's examination by Dr. Jett on the same date.

of voir dire is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *Duvall*, 1991 OK CR 64, ¶ 26, 825 P.2d at 631. The trial court may properly restrict questions that are repetitive, irrelevant or regard legal issues upon which the trial court will instruct the jury. *Nauni v. State*, 1983 OK CR 136, ¶ 12, 670 P.2d 126, 130. There is no abuse of discretion as long as the voir dire questioning is broad enough to afford Appellant a jury free of outside influence, bias or personal interest. *Duvall*, 1991 OK CR 64, ¶ 29, 825 P.2d at 631.

¶ 20 In *Allen v. State*, 1994 OK CR 13, ¶ 22, 871 P.2d 79, 90, *cert. denied*, 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994), we found no merit to the contention that the trial court erred in its refusal to allow counsel to inquire as to lesser included offenses during voir dire. There, we noted each juror indicated he or she could consider a lesser included offense instruction and no abuse of discretion occurred. *Id.*; *see also Patton v. State*, 1998 OK CR 66, ¶ 12, 973 P.2d 270, 281, *cert. denied*, 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999).

¶ 21 Appellant argues the trial court's generalized inquiries into the jurors' individual abilities to follow the law, approved in *Allen*, were inadequate and insufficient. We disagree. The record shows defense counsels were able to conduct voir dire in such a manner as to determine what jurors were free from bias, to determine what jurors were able to follow the law, and to enable them to intelligently exercise their use of peremptory challenges. Accordingly, we find no abuse of discretion.

¶ 22 In Proposition Three, Appellant complains the trial court's excusal of five prospective jurors for cause constituted plain error and requires vacation of Appellant's sentence of death. Specifically, Appellant contends the trial court removed five prospective jurors for cause without making adequate inquiry into their individual abilities to set aside their opposition to imposition of the death penalty and to consider all punishment options.

¶ 23 The standard for striking a prospective juror for cause based on his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *Knighton v. State*, 1996 OK CR 2, ¶ 15, 912 P.2d 878, 885, *cert. denied*, 519 U.S. 841, 117 S.Ct. 120, 136 L.Ed.2d 71 (1996). A venireman who is willing to consider all sentencing options and who is not "irrevocably committed" to one sentence before trial has begun is fit to serve and not vulnerable to removal for cause. *Miller v. State*, 1998 OK CR 59, ¶ 21, 977 P.2d 1099, 1106, *cert. denied*, 528 U.S. 897, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999); *Hain v. State*, 1996 OK CR 26, ¶ 21, 919 P.2d 1130, 1138, *cert. denied*, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).

¶ 24 The record of voir dire shows each of the five potential jurors who were excused for cause because of his or her opposition to the death penalty could not consider all of the punishment options. Each stated unequivocally that he or she could not impose the death penalty under any circumstances. Three were opposed to the death penalty because of religious reasons; the other two were opposed to it for personal or philosophical reasons. Counsel did not object to their removal, *waived* Appellant's last peremptory challenge, and we find no plain error occurred under the record before us.[11] *See*

11. When the trial court inquired of venireman Sims whether he could consider all three possible punishments if Appellant were found guilty of first degree murder, Sims stated he did not "believe in the death penalty. It's against my religion." He said he had held the same religious beliefs since 1974 and it was something he had thought about. He said unequivocally he could not impose the death penalty under any circumstances. Defense counsel admitted Sims' answers were "emphatic" and did not object to his removal.

As to venireman Gray, the record discloses he had formal legal education and had practiced law in the past. When asked if he could consider all three punishments, he affirmatively and unequivocally said he could not. He spe-

*McCarty v. State,* 1998 OK CR 61, ¶ 79, 977 P.2d 1116, 1135, *cert. denied,* 528 U.S. 1009, 120 S.Ct. 509, 145 L.Ed.2d 394 (1999). As Appellant has not shown prejudice by the removal of these prospective jurors, we find his claim that trial counsel was ineffective for failing to object to their removal is without merit.

¶ 25 In Proposition Four, Appellant complains that error occurred when the trial court failed to require the jurors' individual notes of the proceedings be "impounded and made part of the record on appeal." He claims the destruction of the jurors' notes has deprived him of a complete record on appeal and requires reversal.

¶ 26 In *Cohee v. State,* 1997 OK CR 30, ¶ 5, 942 P.2d 211, 213, we held jurors may take their notes into the jury room during deliberations. In Guideline 4(B), *Guidelines Governing Juries in Criminal Trials,* adopted in *Cohee,* we specifically directed that juror notes "shall be collected and destroyed ... and such notes shall not be used or referenced in any subsequent proceedings or appeal." *Cohee,* Attachment I.

¶ 27 Title 12 O.S.1991, § 2606(B) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify as to any matter or statement occurring during the course of the jury's deliberations or as to the effect of anything upon his or another juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes during deliberations. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. An affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying shall not be received for these purposes.

We believe the language of § 2606(B) establishes such notes should *not* be considered on appellate review. Reviewing juror notes on appeal directly impinges upon the jury's deliberative process and the individual juror's mental processes during deliberations. Appellant has no more right to examine these notes on appeal than he does to interrogate the jurors about what information they used to arrive at their verdict.

¶ 28 Although this Court has not previously addressed this precise question, the Oklahoma Supreme Court has and arrived at a similar conclusion. *Sligar v. Bartlett,* 1996 OK 144, ¶ 12, 916 P.2d 1383, 1386–1387; *see also State v. Williams,* 80 Ohio App.3d 648, 653, 610 N.E.2d 545, 548 (Ohio App. 9 Dist. 1992); *State v. Kipf,* 234 Neb. 227, 254, 450 N.W.2d 397, 415 (Neb.1990); *United States v. Maclean,* 578 F.2d 64, 65–66 (3rd Cir. 1978)(when jurors are allowed to take notes into deliberations, such notes should be treated as confidential between the juror making them and his fellow jurors). Accordingly, we find Appellant has not been denied a complete appeal record and meaningful review because of the destruction of the jurors' notes. Proposition Four does not warrant relief.

*First Stage Issues*

¶ 29 In Proposition One, Appellant complains that the suggestive pretrial identification procedure tainted the subsequent identification of Appellant at trial in violation of his federal and state constitutional rights. The

cifically stated "I could not impose the death penalty." His reasons were social and religious. He was removed without objection. Venirewoman Morrison said she could not impose the death penalty for religious reasons. When asked, she specifically said she could not envision any facts or circumstances under which she would consider the death penalty an appropriate punishment, even when a person committed malice aforethought murder. Her answer was unequivocal. She was excused without objection.

Venireman Dehaberman similarly stated that for personal reasons, he was opposed to, and could not under any circumstances impose, the death penalty. His answers were emphatic. He was excused without objection.
Venireman Morton also stated for philosophical reasons, he was opposed to the death penalty and could not consider it as a punishment option under any circumstances. When asked if he could fairly and equally consider all three punishment options, he said he did not believe he could. He was excused without objection.

only witness who identified Appellant at trial was Karl Robinson. Appellant argues Robinson's in-court identification was tainted and improperly bolstered by the unnecessary one person show-up procedure utilized by the police at the hospital.[12]

¶ 30 As an initial matter, we do not believe the "one man show-up" at the hospital shortly after the shooting was unduly suggestive or improper. The record does not demonstrate that either witness was told the person at the hospital was in fact a suspect or one of the shooters. Furthermore, it was entirely appropriate for the officers to try to discover whether "Roy Brown" was involved in the shooting to determine whether he should be further detained. "An on the scene confrontation between the victim and the suspect shortly after the commission of the crime may be justified where prompt identification is necessary to determine whether the suspect is the offender or whether police officers should continue their search." *Harrolle v. State,* 1988 OK CR 223, ¶ 7, 763 P.2d 126, 128. In some circumstances, an identification through a "one man show-up" near the time of the alleged criminal act tends to insure accuracy rather than bring about misidentification. *Id., see also Plunkett v. State,* 1986 OK CR 77, ¶ 8, 719 P.2d 834, 838–839, *cert. denied,* 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986).

¶ 31 Even if we were to find the "show up" was unduly suggestive and encouraged misidentification, the same would not automatically invalidate the subsequent in-court identification if that identification can be established as independently reliable under the totality of the circumstances. *Berry v. State,* 1992 OK CR 41, ¶ 13, 834 P.2d 1002, 1005. This Court uses a test that includes consideration of all the surrounding circumstances plus the following:

1) prior opportunity of the witness to observe the defendant during the alleged criminal act;

2) degree of attention of the witness;

3) accuracy of the witness' prior identification;

4) the witness' level of certainty; and,

5) the time between the crime and the confrontation.

*Id., see also Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Stiles v. State,* 1992 OK CR 23, ¶ 41, 829 P.2d 984, 993, *cert. dismissed,* 516 U.S. 1167, 116 S.Ct. 1257, 134 L.Ed.2d 206 (1996).

¶ 32 Robinson testified at trial that while he was talking to his wife on the telephone, he saw two men walk into the Charles Steak House and knew they were not "regulars." He heard a patron yell to keep an eye on those guys. Because he did not know the men, he got off the phone and focused his attention on the men as they walked down the ramp into the gaming room. Robinson was able to describe the skin color, height, and clothing of both men. He also heard the taller man say "All of you SOBs are going to die" as the taller man pulled out his gun. At that point, Robinson ran into the kitchen to escape the gunfire. Within minutes of the shooting, Robinson saw Appellant at the hospital and told officers he recognized the shirt. Although Robinson was unable to identify Appellant at the preliminary hearing, he, as well as other witnesses, testified at trial that Appellant's appearance had changed since the preliminary hearing.

¶ 33 Under these circumstances, Appellant has not shown merely by Robinson's inability to identify him at the preliminary hearing that his in-court identification at trial was unreliable. Robinson's testimony at trial was certain and reflected his degree of attention towards the gunmen was concentrated. We find his in-court identification was not so tainted and unreliable as to have been inadmissible. Additionally, circumstantial evidence and DNA evidence connected Appellant to the crime. Therefore, even if there was error in allowing the in-court identification, we find the error was harmless beyond a reasonable doubt. 20 O.S.1991, § 3001.1.

12. Prior to trial, counsel filed a Motion to Suppress Extrajudicial Identification and supporting brief. The matter was argued and denied on January 9, 1998. Counsel made contemporaneous objections at trial.

¶ 34 In Proposition Six, Appellant argues the evidence was insufficient to prove beyond a reasonable doubt that he killed Joseph Sutton with malice aforethought. Appellant submits the trial court erred when it denied his motion for directed verdict and demurrer. However, Appellant waived his right to appeal the ruling on demurrer when he presented evidence after the State rested its case. *Mayes v. State*, 1994 OK CR 44, ¶ 40, 887 P.2d 1288, 1302, *cert. denied* 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995); *Smith v. State*, 1973 OK CR 243, ¶ 25, 509 P.2d 1391, 1397.

¶ 35 The question of the sufficiency of the evidence to sustain a conviction is to be determined by examination of the entire record. *Smith*, 509 P.2d at 1397. When the sufficiency of evidence is challenged on appeal, this Court will determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *See Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203.

¶ 36 The jury was instructed on the elements of first degree murder with malice aforethought and was also instructed

"Malice aforethought" means a deliberate intention to take away the life of a human being. As used in these instructions, "malice aforethought" does not mean hatred, spite or ill-will. The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before commission of the act.

The evidence, viewed in a light most favorable to the State, shows Appellant entered the restaurant, armed with a gun, with the intent to commit armed robbery, and demanded money. His action in firing his weapon at least four times directly at Joseph Sutton support the jury's conclusion that he acted with malice aforethought.

¶ 37 Appellant also claims the evidence was insufficient to show identity, based upon his belief that the identification testimony was not reliable and did not conclusively show Appellant committed the shooting. However, we have already determined the identification testimony was properly admitted. The jury properly considered the evidence presented, was appropriately instructed on the use of eye-witness identification testimony, and concluded the State's evidence was sufficient to show Appellant committed the offense.

¶ 38 "Although there may be conflict in the testimony, if there is competent evidence to support the jury's finding, this Court will not disturb the verdict on appeal." *Cheney v. State*, 1995 OK CR 72, ¶ 44, 909 P.2d 74, 86, *quoting Woodruff v. State*, 1993 OK CR 7, ¶ 30, 846 P.2d 1124, 1134, *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). Review of the entire record reveals sufficient evidence supported the jury's conclusions that Appellant killed Sutton and did so with malice aforethought. We find no merit in this proposition.

¶ 39 Appellant, in Proposition Seven, argues the State's reliance in opening statement on evidence that it did not introduce at trial violated Appellant's federal rights to confrontation, to due process, and to a fundamentally fair trial.[13] Prior to first stage deliberations, the prosecutor acknowledged that a witness she referred to in opening statement had not testified because the State could not locate him for trial.[14] Defense counsel stated he did not believe counsel for the State acted in bad faith. However, be-

13. During opening statement, the prosecutor said Appellant's county jail cellmate would testify that he saw Appellant remove the bullet from his back and flush it down the toilet. She said this cellmate would identify the bullet as either a 9 millimeter or .380 ammunition, and would also testify that Appellant told him he "only got hit once, the other guy got hit four times." The prosecutor also stated the evidence would show the victim's gun fired .380 ammunition.

14. According to the prosecutor's statement, the State tried diligently to locate the witness and spoke with his wife who indicated he took her car and left and told her when he left he was afraid to testify at trial.

cause the prosecutor made evidentiary statements about what the witness would testify to, counsel moved for a mistrial and would not agree an admonition to the jury would cure the error. The trial court denied the motion for mistrial.

¶ 40 The purpose of an opening statement is to inform the jury of the evidence the attorneys expect to present during the trial. *Ledbetter v. State*, 1997 OK CR 5, ¶ 76, 933 P.2d 880, 890. Statements by the attorneys are not evidence and we have in the past recognized that a prosecutor may in good faith tell the jury what he expects to prove, only to have that evidence evaporate during the case-in-chief. *Id.* Failure to prove all remarks made in opening statement in the absence of a showing of bad faith and prejudice is not grounds for reversal. *Shultz v. State*, 1991 OK CR 57, ¶ 11, 811 P.2d 1322, 1328.

¶ 41 Here, defense counsel conceded the State did not act in bad faith when it did not produce a witness referred to in opening statement. However, Appellant asserts the State *did* act in bad faith in closing argument when the prosecutor emphasized the evidence rather than retracted it. Appellant argues he was prejudiced by the insertion of and emphasis on this improper evidence.

¶ 42 We disagree. According to the State, the witness who did not appear would have testified he saw Appellant remove the bullet lodged in his back and dispose of it. In closing argument, the State did not refer to the absent witness. Rather, the State relied upon other circumstantial evidence and drew a reasonable inference from that evidence—that Appellant caused the bullet lodged in his back to dislodge in hopes of preventing the State from analyzing that evidence. After careful consideration of the record, we find this was proper comment on the evidence presented and did not constitute bad faith on the part of the State nor did it constitute prejudicial error. *Ellis v. State*, 1982 OK CR 151, ¶ 16, 651 P.2d 1057, 1062.

### Evidentiary Issues

¶ 43 In Proposition Eight, Appellant submits the trial court made six evidentiary errors which violated his rights to due process, to a fair trial and to a reliable sentencing proceeding. Appellant argues the trial court erred in admitting an inadmissible hearsay statement under the coconspirator exclusion. *See* 12 O.S.1991, § 2801(4)(b)(5). Karl Robinson was allowed to testify that the codefendant said "All you SOBs are going to die."

¶ 44 12 O.S.1991, § 2801(4)(b)(5) provides a statement is admissible and is not hearsay if it is "offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." *Omalza v. State*, 1995 OK CR 80, ¶ 13, 911 P.2d 286, 295. A coconspirator's statements satisfy the requirements of reliability and are admissible as non-hearsay substantive evidence only where the trial court finds: (1) a conspiracy existed; (2) both the defendant and the alleged coconspirator declarant were parties to the conspiracy; (3) the statements were made during the duration of the conspiracy; and (4) the statements furthered the goals of the conspiracy. *Id.*, 911 P.2d at 296; *see also Harjo v. State*, 1990 OK CR 53, ¶ 25, 797 P.2d 338, 345. However, before alleged coconspirator statements can be admitted against a party, the trial court is required to hold an *in camera* hearing to determine whether a conspiracy existed. *Id.* The conspiracy must be proven by a preponderance of evidence and the trial court may consider the alleged hearsay statements in reaching its decision. *Id.*

¶ 45 The record reveals and the State concedes the trial court admitted the codefendant's statement without conducting an *in camera* hearing. The State concedes the statement was admitted prior to the admission of other evidence establishing a conspiracy existed. However, the State submits and we agree that Appellant was not prejudiced by this omission and any error in the admission of this statement was harmless beyond a reasonable doubt. *See Powell*, 2000 OK CR 5, ¶ 76, 995 P.2d 510, 529. The State's evidence ultimately and sufficiently established a conspiracy existed between Appellant and the co-defendant to rob the patrons of the Charles Steak House.

¶ 46 Appellant contends the prosecutor's improper use of leading questions during the examination of Clemuel Brown confused and misled the jury. We have reviewed the complained of line of questioning, and while we find the prosecutor could have phrased her questions differently, we do not find the line of questioning conveyed an erroneous impression to the jury or that it was so improper as to require reversal. *Guance v. State*, 1988 OK CR 39, ¶ 14, 751 P.2d 1074, 1077 ("a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the fairness must be viewed in context").

¶ 47 Next, Appellant complains admission of a "morgue photograph highlighting the gunshot wounds" and medical examiner body charts were irrelevant and prejudicial. The admission of photographs and demonstrative evidence is within the sound discretion of the trial court and we will not disturb those rulings absent an abuse of discretion. *Davis v. State*, 1999 OK CR 16, ¶ 31, 980 P.2d 1111, 1119; *Le v. State*, 1997 OK CR 55, ¶ 25, 947 P.2d 535, 548, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). The complained of exhibits accurately depict the location of the gunshot wounds to the deceased and corroborate the testimony of the medical examiner as to the location and trajectory of the gunshot wounds. We find the probative value of the exhibits is not outweighed by the alleged prejudicial impact and the trial court did not abuse its discretion by admitting the evidence.

¶ 48 Appellant claims the trial court erred when it prohibited defense counsel from questioning police witnesses concerning their investigation into the handgun and cash found in Ben Griffin's van. He claims that evidence of a "possible presence of a third weapon during the incident was relevant to the issue of malice" and contends he was denied the right of cross-examination as a result and error of constitutional magnitude occurred. The scope and method of cross-examination is to be managed accord-

ing to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Miller v. State*, 1998 OK CR 59, ¶ 46, 977 P.2d 1099, 1110, *cert. denied*, 528 U.S. 897, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999). The testimony of the ballistics examiner at trial confirmed that the three projectiles found at the scene were conclusively determined not to have been fired from Ben Griffin's gun. Under these circumstances, we cannot find the trial court abused its discretion.

¶ 49 Appellant contends the admission of the "combined DNA statistical probability results from Lab Corp" without making a threshold determination of reliability constituted error. Defense counsel objected to this evidence, because the probability analysis was based on hearsay; no objection was made to the admission of DNA evidence based upon a reliability determination. Appellant's failure to object at trial on the grounds he now raises on appeal waives review for all but plain error. *Turrentine v. State*, 1998 OK CR 33, ¶ 66, 965 P.2d 955, 975, *cert. denied*, 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562 (1998). We find the trial court's denial of the objection defense counsel made at trial was proper and no plain error occurred as the DNA analyst could properly rely upon the test results of other experts in arriving at her probability calculation. *See Lewis v. State*, 1998 OK CR 24, ¶ 19, 970 P.2d 1158, 1166–1167, *cert. denied*, 528 U.S. 892, 120 S.Ct. 218, 145 L.Ed.2d 183 (1999).[15]

¶ 50 Last, Appellant challenges the cross-examination of Dr. Phillip Murphy. Defense counsel's objections to the questions complained of were sustained. On appeal, Appellant contends the prosecutor's actions in placing improper evidence before the jury prejudiced him, violated due process, and requires reversal of his convictions. We disagree. Any error was cured when the trial court sustained defense counsel's contemporaneous objections. *Brown v. State*, 1998 OK CR 77, ¶ 88, 989 P.2d 913, 933. Appellant's

---

15. We have recently held that Polymerase Chain Reaction (PCR) DNA testing is reliable and admissible in the State of Oklahoma. *Wood v. State*, 1998 OK CR 19, ¶ 40, 959 P.2d 1, 11; *Alverson v. State*, 1999 OK CR 21, ¶ 20, 983 P.2d 498, 509.

failure to object to the prosecutor's questions to Murphy concerning whether a copy of his report was given to the State waives all but plain error, and we do not find plain error occurred. *Turrentine*, 965 P.2d at 975.

### Jury Instruction Issues

¶ 51 In Proposition Five, Appellant argues reversible error occurred when the trial court refused to give his requested instructions on lesser-included offenses. Without such instructions, Young argues, the jury's only options were convicting or acquitting him of first degree murder. Young relies on the authority of *Schad v. Arizona*, 501 U.S. 624, 644–48, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), *Beck v. Alabama*, 447 U.S. 625, 633–45, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), *Pickens v. State*, 1994 OK CR 74, ¶ 8, 885 P.2d 678, 682–683, and *Hogan v. Gibson*, 197 F.3d 1297 (10th Cir.1999) to argue that the trial court's failure to provide the jury with a third, non-capital option violated his Eighth and Fourteenth Amendment rights. We disagree.

¶ 52 *Beck* and *Schad* held that "in death cases, the jury must be instructed on lesser included noncapital offenses supported by the evidence, in order to give the jury a viable option between acquittal and a death penalty offense." *Pickens, id.* at ¶ 8, 885 P.2d at 682. Lesser included offense instructions need not automatically be given in death cases, but are required only when supported by the evidence. *Charm v. State*, 1996 OK CR 40, ¶ 7, 924 P.2d 754, 759, 760, *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997). To succeed on his claim that the trial court's failure to instruct the jury on lesser included offenses violated *Beck*, Appellant must demonstrate the evidence presented at trial "would permit a rational jury to find him guilty" of the lesser offense. *Hogan*, 197 F.3d at 1307 (citations omitted).

¶ 53 In *Hogan*, the Tenth Circuit reversed an Oklahoma conviction for first degree murder, holding the conviction violated *Beck*. The court stated,

> [B]y denying the jury the option to convict him on a lesser, non-capital offense *supported by the evidence*, thus leaving only a

choice between conviction of capital murder and acquittal, Oklahoma may have "encourage[d] the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished."

*Hogan*, 197 F.3d at 1312. (emphasis added) (citations omitted).

¶ 54 This case is distinguishable from *Hogan*, as the evidence presented at trial would not have permitted a rational jury to find Appellant guilty of any of the lesser included offenses and acquit him of first-degree murder. The trial judge's refusal to administer the requested instructions on lesser offenses did not violate *Beck* and *Schad*.

¶ 55 At trial, Young's defense was that he was shot somewhere else and had no connection with the Charles Steak House shootings. Appellant offered no alibi witness, and other witnesses testified no report was made in those early morning hours of any shooting near a 7–11 convenience store and Autozone store. Despite the manner in which the case was defended, Appellant requested instructions on first degree heat-of-passion manslaughter, first degree manslaughter by resisting criminal attempt, second degree depraved mind murder and second degree felony murder, and the trial court denied the requested instructions.

¶ 56 A trial court is required to instruct on all lesser included or lesser related offenses warranted by the evidence. *Childress v. State*, 2000 OK CR 10, ¶ 14, 1 P.3d 1006; *Shrum v. State*, 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036; *Boyd v. State*, 1992 OK CR 40, ¶ 9, 839 P.2d 1363, 1367, *cert. denied*, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993); *Fowler v. State*, 1989 OK CR 52, ¶ 29, 779 P.2d 580, 585, *cert. denied* 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990); *Lee v. State*, 1985 OK CR 62, ¶ 8, 700 P.2d 1017, 1019. A defendant is not entitled to an instruction on a lesser included offense when the evidence presented will not reasonably support a conviction for the lesser offense. *Childress, id., Shrum, id.*; *Clayton v. State*, 1995 OK CR 3, ¶ 12, 892 P.2d 646, 653, *cert. denied*, 516 U.S. 846,

116 S.Ct. 137, 133 L.Ed.2d 84 (1995); *Duvall v. State,* 1991 OK CR 64, ¶ 9, 825 P.2d 621, 627; *Hale v. State,* 1988 OK CR 24, ¶ 19, 750 P.2d 130, 136, *cert. denied* 488 U.S. 878, 109 S.Ct. 195, 102 L.Ed.2d 164 (1988); *Foster v. State,* 1986 OK CR 19, ¶ 30, 714 P.2d 1031, 1039, *cert. denied* 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986).

¶ 57 It is the duty of the trial court to determine as a matter of law whether the evidence is sufficient to justify the submission of instructions on a lesser included offense to the jury. *Williams v. State,* 1991 OK CR 28, ¶ 14, 807 P.2d 271, 274; *James v. State,* 1987 OK CR 79, ¶ 12, 736 P.2d 541, 545, *cert. denied,* 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 406 (1987). We find the trial court did not err in refusing the requested instructions.

¶ 58 Appellant claims sufficient evidence was presented to support instructions on first degree heat-of-passion manslaughter, because it showed he fired on Sutton out of fear after Sutton "drew and fired, or at least attempted to fire." Appellant argues his shooting of Sutton was triggered by his fear and therefore supported an instruction on heat-of-passion manslaughter. He claims an instruction on manslaughter by resisting criminal attempt was also warranted by the evidence showing he shot Sutton to keep Sutton from shooting him.

¶ 59 We disagree with Appellant's description of the evidence. By all accounts, Appellant and his co-intruder instigated the whole incident when they entered the Charles Steak House with the intent to commit robbery; they were armed, made threats, and demanded money. Things went amiss when Appellant's intended robbery victim tried to thwart the robbery and defend himself with his own weapon. Sutton's weapon, however, did not fire and Appellant fired at him. The medical examiner testified the four gunshot wounds to Sutton's body were in a right to left and *downward* trajectory, and the gunshot wound which caused Sutton's death entered the *back* of his chest. The medical examiner also testified the exit wound of the number two bullet demonstrated Sutton's body was up against something hard which kept it from exiting. The physical evidence suggests Appellant continued to shoot Sutton after he had fallen to the ground.

¶ 60 While we agree that a passion arising from fear may reduce a homicide from murder to manslaughter, the cases cited by Appellant are distinguishable. In *Hayes v. State,* 1981 OK CR 96, ¶ 2, 633 P.2d 751, 752, the appellant testified he was afraid when the victim came at him with a knife and that he shot the man in self-defense. On appeal, the court found the instruction on manslaughter was properly given. *Id.* In *Wood v. State,* 1971 OK CR 232, ¶¶ 2–4, 486 P.2d 750, 751–752, the defendant, while trying to defend himself, hit a man with a board during a street brawl. There, in modifying the conviction from murder to manslaughter, the Court noted absence of proof of premeditation or intentional design where there was no "proof the defendant had a motive, sought out the deceased, or even knew him." *Id.,* 1971 OK CR 232, ¶ 14, 486 P.2d at 753. Here, the circumstances surrounding the shooting clearly show Appellant and his cohort planned and instigated the entire deadly situation. Further, the evidence suggests Appellant shot Sutton while Sutton was on the ground. He was not entitled to instructions on a reduced degree of homicide simply because an intended victim chose to defend himself.

¶ 61 Similarly, we find Appellant was also not entitled to instructions on second degree depraved mind murder. While we would concede Appellant's imminently dangerous conduct caused the death of Joe Sutton, we simply cannot interpret the evidence to show he committed such conduct without a particularized intent. "A design to effect death [*i.e.,* premeditation] is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed. 21 O.S.1991, § 702. Premeditation sufficient to constitute murder may be formed in an instant." *Patton,* 1998 OK CR 66, ¶ 36, 973 P.2d at 286; *Boyd,* 1992 OK CR 40, ¶ 11, 839 P.2d at 1367. Malice aforethought may be proved by circumstantial evidence. *Cavazos v. State,* 1989 OK CR 53, ¶ 11, 779 P.2d 987, 989.

¶ 62 Appellant entered the business with the intent to rob its occupants with the use of a deadly weapon. He stood directly in front of Joe Sutton, raised his weapon, and demanded money. He fired upon Sutton when Sutton tried unsuccessfully to defend himself. The physical evidence showed the gunshot wound that killed Sutton entered through the right side of the back of his chest. Malice can be inferred from these facts and the evidence did not require an instruction on depraved mind second degree murder.

¶ 63 Appellant also argues the evidence supported an instruction on second degree felony murder, based upon the underlying felony of attempted robbery.[16] As the predicate felony for second degree felony murder, robbery or attempted robbery cannot be accomplished with a deadly weapon. *See Foster*, 1986 OK CR 19, ¶ 31, 714 P.2d at 1039. We decline to revisit our interpretation of 21 O.S.1991, § 801, as set forth in *James v. State*, 1981 OK CR 145, ¶ 13, 637 P.2d 862, 865, and find the evidence did not warrant an instruction on second degree felony murder.

¶ 64 In Proposition Nine, Appellant argues his federal and state constitutional rights to a fair trial were denied when the trial court improperly instructed the jury on the theory of guilt through aiding and abetting another and when the trial court refused his requested instructions on self-defense. Appellant argues the instructions on aiding and abetting were confusing and did not state the applicable law, because the evidence showed "both intruders were equal participants in the robbery and shooting incident," and argues trial counsel's failure to object to the instructions constitutes ineffective assistance of counsel. The record shows trial counsel requested OUJI–CR 2d. 2–6 and a modified OUJI–CR 2d. 2–5 be given. The trial court did not modify OUJI–CR 2d. 2–5 and instructed the jury using the uniform instructions.

¶ 65 The law is well-settled that all persons concerned in the commission of a crime, whether they aid and abet or actually commit the act constituting the crime, are principals and are equally culpable. *See Conover v. State*, 1997 OK CR 6, ¶ 18, 933 P.2d 904, 910; 21 O.S.1991, § 172. The evidence did not conclusively establish which intruder fired the fatal gunshot; therefore, because the State sought to convict Appellant of malice-murder, instructions on aiding and abetting were appropriately given in this case. *See Ochoa v. State*, 1998 OK CR 41, ¶¶ 46–48, 963 P.2d 583, 599, *cert. denied*, 526 U.S. 1023, 119 S.Ct. 1263, 143 L.Ed.2d 358 (1999); *Torres v. State*, 1998 OK CR 40, ¶ 41, 962 P.2d 3, 16, *cert. denied*, 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed.2d 683 (1999).

¶ 66 Appellant also argues the trial court erred when it refused Appellant's requested instructions on self-defense,[17] because the defense is available to trespassers in retreat. We find Appellant's claim unpersuasive as the evidence does not show either Appellant or his codefendant were trespassers in retreat. The two gunmen entered the Charles Steak House, armed, with the intent to commit robbery. When the victims attempted to thwart the robbery, Appellant and his co-intruder opened fire. Under these facts, the evidence did not require instructions on self-defense. *Le*, 1997 OK CR 55, ¶ 23, 947 P.2d at 547; *see also Nance v. State*, 1992 OK CR 54, ¶ 9, 838 P.2d 513, 515 (instructions on theory of defense should be given if the evidence produced at trial supports the defense). Proposition Nine is therefore denied.

*Second Stage Issues*

¶ 67 In his tenth proposition, Appellant argues the State's use of transactional former felony convictions in the second stage of trial to enhance his convictions for attempted robbery (Count II) and shooting with intent to kill (Count III) was error. The record shows the State acknowledged, and the jury was instructed, that Appellant had admitted one previous conviction. The

---

16. The State did not address this argument. While we find it is plainly without merit, we caution the State to respond to every allegation raised.

17. Appellate counsel did not request instructions dealing with trespassers in retreat.

record also shows his sentences were enhanced under 21 O.S.1991, § 51(A), not 21 O.S.1991, § 51(B), and both sentences are within the statutory range of punishment. The State was not required to "elect" one of the transactional felonies when it sought enhancement under § 51(A). *Compare* 21 O.S. 1991, § 51(A) and § 51(B).[18]

¶ 68 In Proposition Eleven, Appellant contends the trial court's acceptance of defense counsel's stipulation to the prior convictions in support of the prior violent felony aggravator, absent a *Brewer* hearing,[19] rendered the stipulation invalid and improperly placed the aggravator before the jury.

¶ 69 In *Brewer, see f.*19, we established a mandatory procedure to be followed when the State seeks to prove that the defendant was previously convicted of a felony involving the use or threat of violence to a person. Part of this mandatory procedure requires the defendant must personally stipulate that the prior felony conviction(s) alleged by the State involved the use or threat of violence to the person. Counsel for the defendant must not be allowed to stipulate. The trial judge is required to satisfy himself that the defendant understands and appreciates the nature of the proposed stipulation and its consequences before deciding whether to accept the stipulation. *Id.*; *see also Duckett v. State*, 1995 OK CR 61, ¶ 73, 919 P.2d 7, 24, *cert. denied*, 519 U.S. 1131, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997).

¶ 70 The State concedes the requirements of *Brewer* were not met, but contends Appellant was not prejudiced and any error was harmless. We agree. In *Duckett*, the appellant argued his defense counsel entered into a stipulation without a *Brewer* hearing. We found the error "harmless at best," and noted the evidence surrounding the prior felony conviction would have been admissible to prove the continuing threat aggravator re-

gardless of whether the appellant had stipulated to it or not. *Duckett, id.* at ¶ 74.

¶ 71 Similarly, in this case, we find the trial court's failure to conduct a *Brewer* hearing and its acceptance of the stipulation which was not personally made by Appellant was harmless error. The State alleged the continuing threat aggravator and evidence concerning the underlying nature of the prior felony conviction(s) would have been admissible to prove that aggravator if the stipulation had not been entered. *See Pickens v. State*, 1993 OK CR 15, ¶ 37, 850 P.2d 328, 337, *cert. denied*, 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); *Hooker v. State*, 1994 OK CR 75, ¶ 42, 887 P.2d 1351, 1364, *cert. denied*, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995); *Paxton v. State*, 1993 OK CR 59, ¶ 47, 867 P.2d 1309, 1324–25, *cert. denied*, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994). Appellant cannot show prejudice from the stipulation, and we additionally find his claim that trial counsel was ineffective for entering the stipulation is likewise without merit. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

¶ 72 In Proposition Twelve, Appellant argues that errors in the application and imposition of aggravating circumstances in this case require vacation of Appellant's death sentence. Appellant contends the State relied, in part, upon his prior shooting conviction to prove the great risk of death aggravating circumstance and argues the use of that evidence violated the constitutional prohibition against double jeopardy "and the prohibition against duplicative use of evidence in support of aggravating circumstances." The record does not show the State utilized the prior shooting conviction to prove this aggravator. The prosecutor argued Appellant created a great risk of death to more than one person when he fired his

---

18. The cases cited by Appellant as authority requiring the State to "elect" are inapplicable to this case. In those cases, the State sought to enhance under § 51(B). *Miller v. State*, 1984 OK CR 33, ¶ 9, 675 P.2d 453, 455; *Smith v. State*, 1982 OK CR 44, ¶ 5, 644 P.2d 106. Further, we have held transactional rules on enhancement do not apply to capital cases. *Cleary v. State*, 1997

OK CR 35, ¶ 66, 942 P.2d 736, 751; *Pickens v. State*, 1993 OK CR 15, ¶ 38, 850 P.2d 328, 338.

19. *Brewer v. State*, 1982 OK CR 128, ¶ 41, 650 P.2d 54, 63, *cert. denied*, 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983).

bullets inside the Charles Steak House where at least nine people were present.

¶ 73 This aggravating circumstance is proved by a defendant's acts which create a risk of death to another "in close proximity, in terms of time, location, and intent" to the killing. *Le*, 1997 OK CR 55, ¶ 33, 947 P.2d at 549. We decline to overrule *Le*. In this case, the great risk of death aggravator is supported by Appellant's conduct of firing his weapon in the Charles Steak House, killing one person and injuring one other. *See Turrentine*, 1998 OK CR 33, ¶ 80, 965 P.2d at 978.

¶ 74 Next, Appellant claims the continuing threat aggravating circumstance is unconstitutional as applied in Oklahoma and contends there was not sufficient evidence presented to support this aggravator. Because the State used Appellant's prior violent felony convictions to support the prior violent felony aggravating circumstance, Appellant argues the use of the underlying facts of this crime, without more, were insufficient to support the continuing threat aggravator.

¶ 75 We have previously rejected claims that the continuing threat aggravator, as applied in Oklahoma, is unconstitutionally vague or overbroad. *See Wilson v. State*, 1998 OK CR 73, ¶ 78, 983 P.2d 448, 466, *cert. denied*, 528 U.S. 904, 120 S.Ct. 244, 145 L.Ed.2d 205 (1999); *Toles v. State*, 1997 OK CR 45, ¶ 62, 947 P.2d 180, 192, *cert. denied*, 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 746 (1998). As evidence Appellant posed a continuing threat to society, the State argued his "current crimes" and his "past crimes" were both violent and Appellant's actions after the shooting showed a lack of remorse. We find this evidence sufficiently shows Appellant posed a continuing threat to society and have previously held it is not error to use the same evidence to support two aggravating circumstances. *Cannon v. State*, 1998 OK CR 28, ¶ 57, 961 P.2d 838, 852–53.

¶ 76 Appellant also argues the use of OUJI–CR 4–74 broadens the continuing threat aggravator by substituting "future threat" for the required "future conduct" element of the circumstances. We rejected this argument in *Short v. State*, 1999 OK CR 15,

¶ 70, 980 P.2d 1081, 1103–1104, *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000), and do so again.

¶ 77 Appellant contends the State should not be allowed to rely upon multiple counts arising from a single transaction to prove the "prior violent felony" or "continuing threat" allegations in capital sentencing. We reject this argument for the reasons set forth in *Pickens*, 1993 OK CR 15, ¶ 38, 850 P.2d at 338.

¶ 78 Appellant also argues the State's reliance on the same evidence to prove "continuing threat" and "prior violent felony" was duplicative and used the same course of conduct to support the finding of separate and distinct aggravators. However, the record shows the State relied additionally upon evidence of the underlying crime to support the continuing threat aggravator. There was no overlapping error as evidence of the underlying crime itself combined with the past violent conduct showed different aspects of Appellant's character. *Turrentine*, 1998 OK CR 33, ¶ 82, 965 P.2d at 978–79; *see also Malone v. State*, 1994 OK CR 43, ¶ 39, 876 P.2d 707, 717–18 (the Court has upheld this aggravator based upon the sheer callousness of the murder). There was sufficient evidence to prove continuing threat without evidence of prior felony convictions.

¶ 79 In Proposition Thirteen, Appellant argues his death sentence cannot be upheld because the mitigation evidence outweighed the evidence in aggravation. This is a question for the jury to determine based upon the evidence. It is not this Court's duty to substitute its judgment for that of the jury. This Court is only required to perform a sentence review which determines "whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "[w]hether the evidence supports the jury's . . . finding of a statutory aggravating circumstance. . . ." 21 O.S.1991, § 701.13(C).

¶ 80 The Court will review the evidence only to the extent necessary to determine whether sufficient evidence was presented from which a rational trier of fact

could find the aggravating circumstances outweighed the mitigating circumstances and warranted the sentence of death. *See Patton,* 1998 OK CR 66, ¶ 114, 973 P.2d at 299–300; *Gilbert v. State,* 1997 OK CR 71, ¶ 83, 951 P.2d 98, 119, *cert. denied,* 525 U.S. 890, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998); *Fisher v. State,* 1987 OK CR 85, ¶ 25, 736 P.2d 1003, 1011, *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988). Applying this standard, we find sufficient evidence was presented from which the jury could find the aggravating circumstances outweighed the mitigating circumstances.

### Victim Impact Evidence

¶ 81 Appellant, in Proposition Fourteen, submits his death sentence must be vacated, because victim impact evidence violated his federal and state constitutional rights. Young argues he was prohibited from presenting relevant mitigating evidence when the trial court refused to allow the defense to re-open its case upon learning the victim impact witness did not want Young to receive the death penalty. Young submits the victim impact evidence which was presented exceeded statutory and constitutional boundaries. Last, Young argues victim impact evidence is unconstitutional, because it is vague, overbroad and acts as a "super aggravator."

¶ 82 Defense counsel sought to re-open its case to recall the victim impact witness and ask her if she and her family wanted Appellant to receive the death penalty. Counsel's offer of proof reflected his belief the witness would state she understood punishment was the jury's decision but she was not asking for the death penalty as part of her victim impact statement. The trial court denied counsel's motion to re-open, stating it was not "relevant whether they want the death penalty or they want him to go free. I just don't think it's appropriate and it goes beyond what I think the victim impact statement should state."

¶ 83 This Court has held that a victim impact witness' opinion as to the appropriateness of the death penalty is admissible, but is limited to the simple statement of the recommended sentence without amplification. *Conover v. State,* 1997 OK CR 6, ¶ 70, 933

P.2d 904, 913; *Ledbetter,* 1997 OK CR 5, ¶ 31, 933 P.2d at 891. Conversely, we must also hold that a victim impact witness' opinion the defendant should not get the death penalty would also be admissible. To that extent, the trial court's refusal to allow the testimony was error.

¶ 84 However, the decision to permit either party to re-open its case for the purpose of introducing further evidence is within the trial court's discretion. *Guy v. State,* 1989 OK CR 35, ¶ 19, 778 P.2d 470, 475; *Jones v. State,* 1969 OK CR 138, ¶ 4, 453 P.2d 319, 320. Defense counsel moved for a mistrial after the victim impact evidence was given, and when that motion was denied, counsel passed the witness without asking any questions. Counsel gave up the opportunity to ask the witness what penalty she and Young's family thought was appropriate when he passed the witness and thereafter rested the case. While we believe the witness' opinion was relevant and would have been admissible, under these circumstances we cannot say the trial court abused its discretion in denying the motion to re-open.

¶ 85 As to Young's claim the narrative victim impact statement exceeded statutory and constitutional boundaries, we disagree. Title 22 O.S.Supp.1993, § 984 provides:

> "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence.

In *Cargle v. State,* 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, *cert. denied,* 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), this Court concluded that "victim impact evidence should be restricted to those unique characteristic (sic) which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financial-

ly, emotionally, psychologically, and physically impacted on members of the victim's immediate family." *See also Welch v. State,* 1998 OK CR 54, ¶ 23, 968 P.2d 1231, 1242, *cert. denied,* 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999).

¶ 86 The victim impact statement given in this case was devoted to the circumstances following Joe Sutton's death and the manner in which the family dealt with that emotional impact. While we agree that name-calling[20] was not appropriate, the victim impact statement as a whole was within the boundaries discussed in *Cargle* and *Conover,* and we do not find the evidence was more prejudicial than probative.

■ ¶ 87 As to the last sub-part of this proposition, we have consistently found the admission of victim impact evidence is not violative of the Eighth Amendment to the U.S. Constitution and does not act as a "super aggravator". *See Miller,* 1998 OK CR 59, ¶ 69, 977 P.2d at 1113; *Cargle,* 1995 OK CR 77, ¶¶ 67–75, n. 115, 909 P.2d at 826. Proposition Fourteen is hereby denied.

### *Ineffective Assistance of Counsel*

■ ¶ 88 In Proposition Sixteen, Appellant argues he was denied effective assistance of counsel during the second stage of trial as a result of counsel's failure to present mitigation evidence. To successfully prove ineffective assistance of counsel, Appellant must show: (1) that defense counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *see also Douglas v. State,* 1997 OK CR 79, ¶ 108, 951 P.2d 651, 679, *cert. denied,* 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998). Failure to prove either of these elements is fatal to Appellant's entire claim. *Id.*

■ ¶ 89 Young argues trial counsel was ineffective for failing to present mitigating evidence, and specifically for failing to seek out and present available evidence relating to the social impact on the physical, mental, emotional, and moral development of children raised in inner-city ghettos. Young attempts to support this claim by referring to extra-record material filed in support of his Motion for Evidentiary Hearing on Sixth Amendment Claims.[21] Therein, Appellant requested an evidentiary hearing pursuant to Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (1999).

¶ 90 Rule 3.11(B)(3)(b)(i) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing "to utilize available evidence which could have been made available during the course of the trial . . . ." Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11B(3)(b)(i).

¶ 91 In support of his application, Appellant offered the affidavits of two investigators, an affidavit and Curriculum Vitae from James H. Johnson, Jr., Ph.D., and an essay or paper authored by Dr. Johnson. One investigator's affidavit focuses on Appellant's family and social history. The other investigator's affidavit suggests several jurors felt there was little information about Appellant's past and they did not perceive any remorse on Appellant's part. Dr. Johnson's essay focused on the criminal behavior of young African American males raised in the inner city, specifically Los Angeles, California, and emphasized the need to evaluate that behavior based upon the broader family, community and social contexts.

¶ 92 Review of the application and the supporting affidavits shows trial counsel could well have utilized this evidence and it may have been prudent for him to do so. However, Appellant has not shown by clear

---

**20.** In part of her statement, Sutton–Dickerson said "And I wish he hadn't been the perfect target for the bullet from a coward or heartless person with a jaded conscience."

**21.** Appellant's Motion for Evidentiary Hearing on Sixth Amendment Claims was filed on June 21, 1999, simultaneously with Appellant's Brief.

and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize or identify this evidence. The jurors were in fact presented with evidence concerning Appellant's social background and family history through the testimony of his sister, although the evidence was not presented in the same context it would have been if presented by the learned Dr. Johnson. We do not believe the extra-record material establishes by clear and convincing evidence that trial counsel was ineffective for not presenting this mitigation evidence through Dr. Johnson. Accordingly, this proposition of error and Appellant's Motion for Evidentiary Hearing on Sixth Amendment Claims are denied.

*Prosecutorial Misconduct*

¶ 93 In Proposition Seventeen, Appellant claims he was denied a fair trial and reliable sentencing proceeding due to improper remarks by the prosecutor during closing arguments.

¶ 94 First, Appellant contends the prosecutor's argument about his lack of remorse was improper, because there was no evidence to show Appellant lacked remorse; he argues the State cannot rely upon evidence of flight to show a lack of remorse. He also argues lack of remorse argument, without evidence, constitutes impermissible comment on his right to remain silent. At trial, defense counsel objected to the lack of remorse argument on the ground that it was impermissible comment on Appellant's right to remain silent. Whenever a defendant makes a specific objection at trial, no different objections will be considered on appeal. *Romano v. State,* 1995 OK CR 74, ¶ 18, 909 P.2d 92, 109, *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

¶ 95 We have reviewed the complained of comments concerning Appellant's lack of remorse and find they were within the range of permissible argument. The evidence demonstrated Appellant showed no concern for his victim after the crime and his defense was also to cast blame upon the victim rather to accept responsibility. The State's argument on Appellant's lack of re-

morse was proper comment considering these facts.

¶ 96 Appellant also complains the prosecutor improperly argued her personal opinion that the death penalty was the appropriate punishment in this case. No objection was made at trial and our review is therefore for plain error. *Turrentine,* 1998 OK CR 33, ¶ 66, 965 P.2d at 975. The prosecutor may make a recommendation as to punishment. *Salazar v. State,* 1998 OK CR 70, ¶ 31, 973 P.2d 315, 326, *cert. denied,* 528 U.S. 895, 120 S.Ct. 226, 145 L.Ed.2d 190 (1999)(argument that "fitting end is the death penalty" not improper argument). We have reviewed the complained of argument and find no plain error.

¶ 97 Appellant complains the prosecutor's argument relating to his mitigation evidence effectively told the jury to disregard the evidence and misstated the law. Again, no objection was made to this argument. We find the prosecutor was within the bounds of fair argument to comment on the weight of the mitigation evidence from the State's perspective. *Johnson v. State,* 1996 OK CR 36, ¶ 57, 928 P.2d 309, 321, *cert. denied,* 522 U.S. 832, 118 S.Ct. 99, 139 L.Ed.2d 54 (1997).

¶ 98 Next Appellant complains about the prosecutor's argument in response to defense counsel's argument that the death penalty should be reserved for the worst of the worst murderers. Without objection, the prosecutor argued nothing was worse than murder in the first degree and said "[i]f this was an inappropriate case for the death penalty we wouldn't be here. The law wouldn't let us." The prosecutor did not mislead the jury by arguing the worst of the worst applied to all crimes. The argument plainly related to only murder and we find no plain error.

¶ 99 Finally, Appellant argues the prosecutor engaged in improper argument when she argued Appellant did not deserve to live in a "prison environment, not have to go to work every day, get his meals prepared, have a nice clean place to live" while his victim "lies dead in his grave." We have repeatedly condemned prosecutors from Oklahoma County for making this type of

argument and the prosecutor clearly should have known better. *Powell,* 2000 OK CR 5, ¶ 150, 995 P.2d at 539; *Le,* 1997 OK CR 55, ¶ 53, 947 P.2d at 554; *Duckett,* 1995 OK CR 61, ¶ 46, 919 P.2d at 19. As we noted in *Le,* "[n]o amount of mitigating evidence can counter this argument, and if the jury agrees they may not even consider mitigating evidence." *Le,* 1997 OK CR 55, ¶ 53, 947 P.2d at 555. In *Le,* however, we found the appellant had not shown the jury was wholly swayed by counsel's argument since they failed to find one of the aggravating circumstances alleged. *Id.* Here, however, the jury found the existence of all aggravating circumstances that were alleged.

 ¶ 100 Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect deprives the appellant of a fair trial. Because we have found the other complained of arguments to be within the bounds of proper argument, we find the aggregate effect of those comments did not affect the fundamental fairness of the proceeding or undermine the reliability of the sentences imposed. We do not believe the effect of the prosecutor's commentary similar to that condemned in *Le* and *Duckett,* standing alone, affected the jury's ability to fairly weigh the aggravating and mitigating circumstances and find it did not rise to the level of plain error. This proposition of error is therefore denied.

*Miscellaneous Issues*

¶ 101 In Proposition Fifteen, to preserve issues for subsequent "state and federal proceedings," Appellant raises eleven "arguable" assignments of error. The State cites no authority in its Answer, but argues the Proposition is without merit because we have previously rejected each of the claims.

¶ 102 With the exception of one, each of the claims in this proposition have been previously addressed and rejected by this Court and we hereby decline to revisit those claims. *See e.g. Lambert v. State,* 1999 OK CR 17, ¶ 68, 984 P.2d 221, 239, *cert. denied,* 528 U.S. 1087, 120 S.Ct. 816, 145 L.Ed.2d 687 (2000)(trial court not required to define life without parole); *Welch,* 1998 OK CR 54, ¶ 41, 968 P.2d at 1245 (absent an objection to trial

court's failure to follow statutory mandates of 22 O.S.1991, § 894, issue is not properly preserved for appellate review); *Al–Mosawi v. State,* 1996 OK CR 59, ¶ 78, 929 P.2d 270, 287, *cert. denied,* 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997)(evidence on cost-effectiveness of death penalty not relevant evidence under 21 O.S.1991, § 701.10(C)); *Cummings v. State,* 1998 OK CR 45, ¶ 58, 968 P.2d 821, 838, *cert. denied,* 526 U.S. 1162, 119 S.Ct. 2054, 144 L.Ed.2d 220 (1999)(permissive language in jury instruction on mitigating evidence reflects current constitutional standard and avoids infringement on jury's duty to determine individual punishment); *Bryson v. State,* 1994 OK CR 32, ¶ 64, 876 P.2d 240, 262–263, *cert. denied,* 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995)(no error in trial court's refusal to instruct jury it could impose life or life without parole even after finding aggravating circumstance(s)); *Allen v. State,* 1994 OK CR 13, ¶ 81, 871 P.2d 79, 101, *cert. denied,* 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994)(not error to instruct the jury it could impose the death sentence if evidence in aggravation outweighed mitigating evidence); *Romano v. State,* 1993 OK CR 8, ¶¶ 114–116, 847 P.2d 368, 392–393, *aff'd,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994)(decision as to what charge to bring lies within the discretion of the prosecutor); *Fields v. State,* 1996 OK CR 35, ¶ 71, 923 P.2d 624, 637, *cert. denied,* 520 U.S. 1216, 117 S.Ct. 1704, 137 L.Ed.2d 829 (1997)(death penalty scheme is constitutional); *Duckett,* 1995 OK CR 61, ¶ 63, 919 P.2d at 22 (instruction on presumption of life); *Duckett,* 1995 OK CR 61, ¶ 60, 919 P.2d at 21 (no statutory, common-law, or constitutional right to allocution).

 ¶ 103 In the last sub-proposition, Appellant contends the trial court erred when it refused to grant Young an evidentiary hearing and funds for an expert to present evidence to support his claim that the death penalty has no deterrent value and was therefore unconstitutional. Appellant has not demonstrated the death penalty scheme in Oklahoma serves no deterrent value and we find it does not violate the Eighth Amendment to the U.S. Constitution. *See Johnson v. State,* 1987 OK CR 8, ¶ 51, 731

P.2d 993, 1006, *cert. denied,* 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987) (death penalty fulfills compelling state interest); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976) (two principal social purposes of the death penalty are retribution and deterrence).

¶ 104 In Proposition Nineteen, Appellant alleges jurors were influenced during second stage sentencing deliberations by the use of extraneous materials, in this instance—one or more Bibles—by some jurors. With his Brief, Appellant filed an Application for Evidentiary Hearing on Extraneous Information Relied Upon By the Jury, wherein he requested the Court remand this case for an evidentiary hearing on the allegation, pursuant to Rule 3.11(A), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (1999), to "properly develop and supplement the appellate record herein with a complete record on this issue." [22]

¶ 105 We granted the Application for Evidentiary Hearing [23], remanded to the District Court and directed the evidentiary hearing "be limited *solely* to the issue of whether extraneous materials, specifically a Bible or Bibles, were physically brought by one or more jurors into the jury deliberation room, and whether the same was/were referred to and utilized by jurors during the second stage deliberations." [24] After the hearing, Judge Coats filed Findings of Fact on Remand, pursuant to our directive, which show that one juror "may or may not have had a New Testament inside his brief case during the second stage of trial." This particular juror [25] and three other jurors testified at the evidentiary hearing that they did not see, or recall seeing, a Bible in the jury room being utilized by any juror during second stage deliberations. [26]

¶ 106 Only one juror testified a Bible was read in the jury room. Juror Shackleford–Schiavo testified the jury foreman physically had his Bible in the jury room and used the Bible with Juror Leger to read verses from Psalms. Juror Shackleford–Schiavo had previously told Appellant's investigator that she was holding out for a life sentence without parole but verses read from Romans during sentencing deliberations swayed her vote for a death sentence. [27] However, at the evidentiary hearing, Juror Shackleford–Schiavo testified she had read the passage from Romans at night during the voir dire process and said it was not read in the jury room; she also denied telling the investigator that three people were looking in their Bibles during sentencing deliberations. The trial court's findings and the record of the evidentiary hearing show Juror Shackleford–Schiavo changed her testimony from being swayed by Romans 13:1–8 to being swayed by five verses read by Juror Leger from the book of Psalms.

¶ 107 Judge Coats found Juror Shackleford–Schiavo's testimony was inconsistent on direct and cross-examination and inconsistent with the testimony of the other jurors. Her testimony was also not consistent with the affidavit of Investigator John Floyd, with whom she spoke prior to the evidentiary hearing. Upon consideration of the testimony presented at the evidentiary hearing,

---

**22.** Rule 3.11(A) states that "[a]fter the Petition in Error has been timely filed in this Court, and upon notice from either party or upon this Court's own motion, the majority of the Court may, within its discretion, direct a supplementation of the record, when necessary, for a determination of any issue; or, when necessary, may direct the trial court to conduct an evidentiary hearing on the issue."

**23.** *See Order Granting Application for Evidentiary Hearing on Extraneous Information Considered by the Jury During Appellant's Sentencing Trial; Order Setting Due Dates for Record and Additional Briefing Schedule,* F 98–703 (Okl.Cr. January 14, 2000) (not for publication).

**24.** The evidentiary hearing was held on February 2 nd and 4 th, 2000.

**25.** The juror alleged to have had the Bible in his briefcase was the jury foreman Terry Murphy.

**26.** The record of the evidentiary hearing was filed with this Court on February 17, 2000; and Supplemental Briefs of the parties were filed on February 23, 2000 (Appellee), and February 25, 2000 (Appellant).

**27.** Appellant's investigator, Chuck Loughlin, filed an affidavit in support of the Application for Evidentiary Hearing, wherein he revealed the statements made to him by Juror Shackleford–Schiavo.

Judge Coats found there "is no credible evidence that extraneous material [Bible] was brought into the jury room or used during second stage deliberations."

¶ 108 Appellant submits the trial court's Findings of Fact are clearly erroneous and/or unreasonable, adopted the "proposed" order on Findings of Fact and Conclusions of Law submitted by the State *in toto* while disregarding Appellant's proposed Findings of Fact and Conclusions of Law.[28] Appellant encourages this Court to review the record of the hearing *de novo* to determine whether the jury utilized a Bible during second stage deliberations.

¶ 109 Here, the issue to be determined by the trial court on remand was a purely factual issue—whether a Bible or Bibles was/were physically present in the jury room and whether the same was utilized by jurors during deliberations. Accordingly, we afford the trial court's findings on factual issues great deference and will review its findings applying a deferential abuse of discretion standard. *See e.g. Bear v. State,* 1988 OK CR 181, ¶ 8, 762 P.2d 950, 954 (resolution of questions of fact are entitled to special deference by a reviewing court); *Ellis v. State,* 1990 OK CR 43, ¶ 11, 795 P.2d 107, 110 (trial court's resolution of underlying factual questions subject to "clearly erroneous" standard of review).

¶ 110 Applying that standard, we find the trial court's Findings of Fact are supported by the record and are not clearly erroneous. Only one of the five jurors who testified believed a Bible was physically present and utilized during deliberations, and the trial

court found her testimony to be inconsistent and not credible.

¶ 111 At oral argument and in his supplemental brief, counsel for Appellant argued the testimony of the jurors at the evidentiary hearing "substantiated" his claim that "two or more jurors not only considered extraneous evidence of biblical doctrines ... but also relied upon such doctrine it (sic) in voting to sentence Appellant to death, in violation of the trial court's instructions." Appellant contends the source of the extraneous information need not be literally external to the jury and in that vein complains that even discussion of biblical doctrine and scripture between jurors creates a rebuttable presumption of prejudice.

¶ 112 While we have not addressed this precise issue, we are not persuaded by Appellant's argument. While there is no question that a jury's receipt of extraneous material not admitted at trial may have an improper influence upon the jury's verdict, 12 O.S.1991, § 2606 insulates the manner in which a jury reaches its verdict and prohibits inquiry into motives, methods or mental processes used to reach a verdict. That jurors would discuss the biblical propriety of the death penalty or their religious beliefs while deliberating the death penalty does not create a rebuttable presumption that they considered "extraneous material" in reaching their verdict. We do not find it surprising that "conscientious people who are faced with a life and death decision resort to their religious scruples in reaching such a decision.[29] Such deep introspection

28. We granted Appellant's Motion to Supplement Appeal Record with copies of each of the parties' Proposed Findings of Fact which were presented to the District Court after the evidentiary hearing. *See Order Granting Motion to Supplement,* F 1998–703 (Okl.Cr. May 10, 2000) (not for publication).

29. In his supplemental authorities filed after oral argument, Appellant cites a number of cases and a legal treatise relating to the effect of biblical doctrine and biblical writing on juries in criminal trials. Of the cases cited, a number deal with improper prosecutorial references to biblical doctrine which is a question not before us in this case. *See Golden v. State,* 23 Okla.Crim. 243, 214 P. 946, 947, Okla.Crim.App. 243 (1943)(improp-

er prosecutorial biblical reference in closing argument combined with other errors required reversal); *Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630 (1991)(prosecutorial reference to biblical doctrine in argument was per se reversible error); *Bussard v. Lockhart,* 32 F.3d 322 (8th Cir.1994) (trial counsel's failure to object to prosecutor's quotation from scripture was not ineffective assistance of counsel); *Bennett v. Angelone,* 92 F.3d 1336, 1346 (4th Cir.1996) (prosecutor's argument and reading of biblical law to justify the morality of the death penalty was highly improper but did not constitute a denial of due process); *Powell v. State,* 2000 OK CR 5, ¶ 148, 995 P.2d at 538 (prosecutor's argument referring to Romans and the New Testament was improper and was error, but did not deprive the

neither violates principles of justice nor prejudices the defendant." *Bieghler v. State,* 690 N.E.2d 188, 203 (Ind.1997), *cert. denied,* 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998); *see also State v. De-Mille,* 756 P.2d 81 (Utah 1988)(juror's communication to other jurors of prayer and revelation concerning guilt of defendant did not constitute outside influence sufficient to undermine the jury's verdict); *Fields v. State,* 1955 OK CR 66, ¶ 81, 284 P.2d 442, 454 (jury's prayer during deliberative process did not require reversal).[30]

¶ 113 With the exception of Juror Shackleford–Schiavo, whose testimony Judge Coats found inconsistent and *not credible,* each of the jurors who testified at the evidentiary hearing indicated the second stage verdict was based on the law as given by the trial judge and the evidence heard in open court. While there may have been "discussion" of the Bible in general or even specific Bible verses, four of the five jurors testified no one "read" from a Bible during sentencing deliberations. Our holding on this claim is strictly limited to the fact situation before us, and the question whether physically utilizing a Bible and its verses as a reference during sentencing deliberations constitutes error is left for another day. The trial judge considered the evidence, heard the witnesses presented by Appellant, and found a Bible was not a part of the deliberations. This Court does not find an abuse of discretion. Accord-

ingly, on the record before us, we find this proposition of error does not warrant relief.

¶ 114 In Proposition Eighteen, Appellant contends the accumulation of errors in this case require reversal of his convictions and sentences. Although some trial errors occurred, upon review of the effect of the errors cumulatively, we find they did not result in the denial of due process and do not require reversal.

### Mandatory Sentence Review

■■ ¶ 115 In Proposition Twenty, Appellant argues his death sentences were the result of passion, prejudice and multiple arbitrary factors and must be vacated under the Court's mandatory sentence review. In accordance with 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Upon review of the record, we cannot say the sentence of death was imposed because the jury was improperly influenced by passion, prejudice or any other arbitrary factor.

■■ ¶ 116 Turning to the second inquiry, we note the jury was properly instructed on three aggravating circumstances and the jury found the existence of all three: (1) that

---

appellant of a fair trial); *Ex parte Troha,* 462 So.2d 953 (Ala.1984) conviction was reversed for juror misconduct; the juror contacted his brother who was a minister to seek "guidance" in rendering his verdict.

This case is also factually distinguishable from several cases cited by Appellant, because the evidence here did not conclusively establish that material extrinsic to the record was actually received in the jury room. In *People v. Mincey,* 2 Cal.4th 408, 6 Cal.Rptr.2d 822, 827 P.2d 388, 424 (1992), *cert. denied,* 506 U.S. 1014, 113 S.Ct. 637, 121 L.Ed.2d 567 (1992), the trial court learned jurors read from a Bible at the conclusion of the first day of deliberations of the penalty phase of trial. The next day, upon questioning by the trial judge, jurors admitted reading from and discussing the Bible; however, none indicated the reading of verses influenced their decision. While the California Supreme Court acknowledged that it was misconduct for a juror to consider extraneous material, it noted such con-

duct created a presumption of prejudice which may be rebutted by a showing that no prejudice actually occurred. The Court in *Mincey* determined there was no substantial likelihood of prejudice under the facts presented. *Id.* at 425. In *Lawson v. Borg,* 60 F.3d 608, 613 (9th Cir. 1995), the Ninth Circuit held reversal was required for jury misconduct where the jury actually received extra-record evidence, in the form of one juror's conveyance of knowledge concerning the defendant's propensity to violence to other jurors.

30. We find the facts of this case are distinguishable from those in *Tennessee v. Harrington,* 627 S.W.2d 345, *cert. denied,* 457 U.S. 1110, 102 S.Ct. 2913, 73 L.Ed.2d 1320 (1982). There, during sentencing deliberations, the jury foreman buttressed his argument for the death penalty by reading selected biblical passages. Though the court reversed the case on other grounds, it noted without further comment that this error would have required reversal.

Mr. Young had been previously convicted of a felony involving the threat or use of violence; (2) that Mr. Young constituted a continuing threat to society; and, (3) that Mr. Young's actions created a great risk of death to more than one person. We find both the law and the evidence support the jury's determination.

¶ 117 After careful review of the aggravating circumstances and the mitigating evidence, and considering the errors alleged in this appeal, we find the sentence of death is factually substantiated and appropriate. We cannot say the sentence of death is being imposed under the influence of passion, prejudice, or any other arbitrary factor.

¶ 118 Finding no error which warrants reversal of the convictions for Attempted Robbery or Shooting with Intent to Kill or the conviction and sentence of death for First Degree Murder, the Judgments and Sentences entered in Oklahoma County District Court, Case No. CRF 96-2963 are hereby **AFFIRMED**.

STRUBHAR, P.J., and LILE, J., concur.

LUMPKIN, V.P.J., and Chapel, J., concur in results.